UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

| | |
|---|---|
| FRANKLIN INDUSTRIAL COMPLEX, INC. | CASE NO. 01-67459 |
| | Chapter 11 |
| Debtor | Jointly Administered |

--------------------------------------------------------
IN RE:

| | |
|---|---|
| CHRISTINE FALLS OF NEW YORK, INC. | CASE NO. 01-67458 |
| Debtor | |

--------------------------------------------------------
IN RE:

| | |
|---|---|
| TRAFALGAR POWER, INC. | CASE NO. 01-67457 |
| | (Main Case) |
| Debtor | |

--------------------------------------------------------
ALGONQUIN POWER INCOME FUND and
ALGONQUIN POWER CORPORATION, INC.

                    Plaintiffs

| | |
|---|---|
| vs. | ADV. PRO. NO. 06-80254 |

RIDGEWOOD HEIGHTS, INC.
STEVER PROPERTIES, LLC and
TRAFALGAR PROPERTIES, LLC

                    Defendants
--------------------------------------------------------
APPEARANCES:

| | |
|---|---|
| MENTER, RUDIN & TRIVELPIECE, P.C. | JEFFREY A. DOVE, ESQ. |
| Attorneys for Algonquin Entities/Plaintiffs | Of Counsel |
| 308 Maltbie Street, Suite 200 | |
| Syracuse, New York 13204-1498 | |
| | |
| GREEN & SEIFTER, PLLC | ROBERT K. WEILER, ESQ. |
| Attorneys for Defendants | Of Counsel |
| One Lincoln Center | |
| Syracuse, New York 13202 | |

HARRIS BEACH PLLC                          WENDY A. KINSELLA, ESQ.
Attorneys for Debtors                      Of Counsel
One Park Place, 4th Floor
300 South State Street
Syracuse, New York 13202

GUY A. VAN BAALEN, ESQ.
Assistant U.S. Trustee
10 Broad Street
Utica, New York 13501

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

## MEMORANDUM-DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

Before the Court is an Adversary Proceeding commenced by the filing of a complaint on September 1, 2006 ("Complaint") by Algonquin Power Income Fund ("APIF") and Algonquin Power Corporation, Inc. ("Algonquin Power") (collectively, APIF and Algonquin Power are "Algonquin" or "Plaintiffs") seeking to expunge, recharacterize and or equitably subordinate the claims of creditors Ridgewood Heights, Inc. ("Ridgewood"), Stever Properties, LLC ("Stever") and Trafalgar Properties, LLC ("Trafalgar") (collectively, Ridgewood, Stever and Trafalgar are "Defendants") in the subject case.

On October 16, 2006, Defendants filed a Motion to Dismiss the Complaint ("Motion to Dismiss") on the basis of lack of standing, failure to state a claim upon which relief can be granted, failure to join necessary parties and abstention. The Motion was made returnable on December 5, 2006 in Syracuse, New York, and was thereafter consensually adjourned a number of times. Algonquin responded with an Objection to Defendants' Motion to Dismiss, filed on Feb

21, 2007.  Defendants then filed a Reply to Plaintiffs' Objection on March 2, 2007.  Finally,

Algonquin filed a Supplemental Objection to Defendants' Motion to Dismiss on March 5, 2007.

The Court initially heard oral argument on the Motion to Dismiss on March 3, 2007 at its

regular motion term in Syracuse, New York, and adjourned the argument to its motion calendar

in Utica, New York on March 27, 2007.  Following argument on March 27th, the Court gave the

parties until April 13, 2007 to submit any additional memoranda of law, after which the matter

would be considered to be submitted.  On April 13, 2007, both Algonquin and Defendants

submitted final memoranda of law, each of which addressed a recent Eighth Circuit Bankruptcy

Appellate Panel decision, *In re Racing Services, Inc.*, 363 B.R. 911 (8th Cir. B.A.P. 2007).[1]

Also before the Court is a motion filed by Algonquin on March 3, 2007,  in the main case

(Case No. 01-67457),   seeking *nunc pro tunc* authority for it to prosecute the causes of action

alleged in the Complaint.  ("Motion for Permission to Prosecute Action").  This motion, which

was also argued before the Court on March 27, 2007 at Utica, New York, seeks, in the alternative,

an order from the Court deeming such permission unnecessary due to Algonquin's standing to

maintain the Adversary Proceeding.

---

[1] Shortly after this matter was taken under submission, the Second Circuit Court of
Appeals issued its decision in *In re Applied Theory Corp*., 2007 U.S. App. Lexis 16180 (2d Cir.
2007).  This decision affirmed *In re Applied Theory Corp*., 345 B.R. 56 (S.D.N.Y. 2006), a case
relied on by Defendants, cited by both parties, and discussed by the Court in this Decision.  As
neither party was permitted to submit memoranda regarding this recent development, the Court
will address the Second Circuit's decision affirming the District court's holding in *In re Applied
Theory Corp*. in a separate paragraph of the Discussion section of this Decision.

4

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this Adversary Proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1), (b)(2)(A),(B) and (O).  The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure ("Fed.R.Bankr.P.") 7052.

## FACTUAL BACKGROUND

Debtors [2] filed voluntary petitions pursuant to chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code")  in the United States Bankruptcy Court, Eastern District of North Carolina on August 27, 2001.  The cases were transferred to this Court on or about December 26, 2001.

The Court will assume familiarity with the facts set forth in *Trafalgar Power, Inc. v. Aetna Life Ins. Co*., 131 F.Supp.2d 341 (N.D.N.Y. 2001); *Trafalgar Power, Inc. v. Aetna Life Ins. Co*., Nos. 99-1238, 00-1246,  2001 WL 640908 (N.D.N.Y. May 23, 2001);  and *Trafalgar Power, Inc. v. Aetna Life Ins. Co*., 427 F.Supp.2d 202 (N.D.N.Y. 2006).

For purposes of these motions, the following facts, taken from Plaintiffs' Complaint, are

---

[2] Debtors in the instant case are Trafalgar Power, Inc. ("TPI"), Christine Falls of New York, Inc. ("CFC"), Franklin Industrial Complex, Inc. ("Franklin"), (collectively "Debtors"). Marina Development, Inc. ("Marina"), the Debtors' corporate parent, and Pine Run of Virginia, Inc. ("Pine Run"), an out-of-state affiliate, originally filed their petitions along with those of the Debtors.  On November 30 and December 22, 2005, however, Pine Run's and Marina's cases, respectively, were severed from those of the other Debtors, and dismissed without prejudice.

deemed to be true for the sole purpose of this motion:

1)  Defendants are Debtors' affiliates and insiders, pursuant to § 101(2) and (31) of the Code.  *See* Complaint, ¶ 14.

2)  Debtor TPI listed Ridgewood in its petition as the holder of an unsecured non-priority claim in the amount of $11,914,960.09, Stever as the holder of an unsecured non-priority claim in the amount of $15,199.55 and Trafalgar as the holder of an unsecured non-priority claim in the amount of $35,000 ("TPI Affiliate Debt").  *See* Complaint, ¶¶ 15- 17.

3)  Debtor CFC listed Trafalgar and Stever as holders of unsecured non-priority claims in the amounts of $2,500.00 and $237.50, respectively ("CFC Affiliate Debt") (collectively, the TPI Affiliate Debt and the CFC Affiliate Debt are the "Affiliate Debt").  *See* Complaint, ¶¶ 18- 19.

4)  In 1998, Aetna Life Insurance Company ("Aetna") provided $22,500,000 in permanent financing ("Aetna Financing") when it refinanced the construction loan BayBank Boston, N.A. had made to TPI and CFC.  As part of this 1998 permanent financing, Debtors agreed, in writing, that they would take on no additional indebtedness other than the Aetna Financing.  *See* Complaint, ¶¶ 35- 39.

## ARGUMENTS

<u>Complaint</u>

In its Complaint, Algonquin contends that because 1) the Affiliate Debt was taken on in violation of the Aetna Financing, 2) TPI and CFC knowingly and intentionally misrepresented

6

that they owed no debt for borrowed money,  3) TPI and CFC concealed the existence and extent

of the insider claims from Debtors' lenders, and 4) TPI and CFC were undercapitalized at the time

the Affiliate Debt was incurred, the Affiliate Debt must be subordinated to all unsecured claims

in the chapter 11 cases, or recharacterized as equity.  Algonquin also contends that because there

are no books or records from which the Affiliate Debt owed by TPI to Ridgewood can be verified,

that Affiliate Debt should be expunged.

Defendants' Motion To Dismiss

Defendants argue that Algonquin's Complaint should be dismissed for several reasons.

First, Defendants argue that Algonquin lacks standing because it is attempting to act in a

representative capacity and has not followed the proper procedures to obtain the authority to act

on behalf of other unsecured creditors.  Defendants contend that *St. Paul Fire and Marine*

*Insurance Co.*, 884 F.2d 688 (2d Cir. 1989), *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837

(E.D.N.Y. 1995), and *In re Applied Theory Corp.*, 345 B.R. 56 (S.D.N.Y. 2006) stand for the

proposition that "proceedings for equitable subordination must be brought by the debtor in

possession as a representative of the estate."  *See* Motion to Dismiss, ¶ 3.  Also, Defendants argue

that, pursuant to *In re STN Enterprises*, 779 F.2d 901 (2d Cir. 1985), and *In re Housecraft*

*Industries USA, Inc.*, 310 F.3d 64 (2d Cir. 2002), an Adversary Proceeding commenced by a party

in a representative capacity cannot be maintained without a) the unjustifiable refusal of the debtor

in possession to bring the suit and, b) court approval to act as a representative after the party

seeking to so act has moved the court for permission to do so.

Defendants contend that the reason for these procedural conditions precedent to the

commencement of an Adversary Proceeding seeking equitable subordination, as set out in *STN* and *Housecraft*, is exemplified by the facts in this case. They contend that if these procedures were followed here, the Court would have been able to examine important threshold issues such as whether Algonquin is an appropriate representative of the creditor body, or whether Algonquin is even a party in interest with a financial stake in the outcome of this litigation.

Defendants also argue that the Complaint should be dismissed for failure to join all necessary parties. They contend that Rule 19 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") (made applicable here by Fed.R.Bankr.P. 7019) dictates that, at a minimum, the Debtors should have been joined to avoid "leav[ing] any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." *See* Motion to Dismiss, ¶ 12, citing Fed.R.Civ.P. 19(a)(2)(ii). Defendants contend that without joinder of the Debtors, "there is no vehicle to bind the estate and creditors and equity holders to the outcome." *See* Motion to Dismiss, ¶ 14. The Defendants also assert that it "is not feasible to join all parties in interest in this Adversary Proceeding...therefore the Complaint should be dismissed." *See id.* at ¶ 15.

Lastly, the Defendants argue that if the Complaint is not dismissed, the Court should abstain from ruling on it because the relief sought is not ripe for adjudication. Defendants contend that the relief sought is not ripe because "it is not necessary to determine the classification and treatment of Defendants' claims" until there is a pending plan of reorganization. *See id.* at ¶¶ 16- 21.

8

Objection to Motion to Dismiss

In response to the Defendants' Motion to Dismiss, Algonquin makes several arguments.

First, Algonquin argues that Defendants' assertion that, pursuant to *STN* and *Housecraft*,

Algonquin should have first requested the Debtors to commence an action against the Defendants

is "folly."  *See* Objection to Defendants' Motion to Dismiss, ¶ 4.  This is so, Algonquin asserts,

because the Defendants are affiliates of the Debtors (*see* Complaint, ¶ 14): the Defendants are

owned directly, and the Debtors indirectly, by the same individual, Arthur Steckler ("Steckler").

Moreover, Algonquin argues that Steckler, with the filing of the Debtors' petitions, effectively

swore that the Debtors owed a legitimate debt of nearly $12,000,000 to the Affiliates.  In order

to commence the action Algonquin is currently pursuing, Steckler would have to prove, in effect,

that this was not a legitimate debt, contradicting the information contained in the Debtors' own

schedules.

Secondly, Algonquin argues that the cases cited by Defendants for the proposition that

Algonquin must seek Court approval to maintain this Adversary Proceeding are inapposite.  Those

cases (*STN*, *Housecraft*, and *Applied Theory*), Algonquin contends, involve statutory claims

asserted by statutory committees which, pursuant to the Code, belong to the debtor or a Chapter

11 trustee.  Algonquin maintains that in this action Code § 502(a) provides standing, and that this

section of the Code does not require these claims to be brought by the debtor or a trustee.

Algonquin also argues that these claims either belong only to creditors, or cannot be brought by

the Debtors or Trustee because of the Wagoner Rule.[3]

---

[3] The Wagoner Rule states that "a trustee cannot sue third party professionals for allegedly
aiding and abetting corrupt management in a scheme to defraud the debtor corporation; *such a
cause of action accrues to the creditors* of the defunct corporate entity, not the trustee."  *See*

Algonquin also takes issue with the Defendants' invocation of the specific case law, denying that *St. Paul Fire and Marine Insurance Co.*, *In re 9281 Shore Road Owners Corp.*, *Applied Theory*, and *In re Lockwood*, 14 B.R. 374 (Bankr. E.D.N.Y. 1981), stand for the proposition that "proceedings for equitable subordination *must* be brought by the debtor in possession as a representative of the estate." *See* Motion to Dismiss, ¶ 3 (emphasis added).

Instead, Algonquin contends that 1) *St. Paul Fire and Marine Insurance Co.* does not involve an equitable subordination, 2) *9281 Shore Road Owners Corp.* actually held that a proceeding to subordinate a claim *may* be initiated with court approval by a party in interest, 3) *Applied Theory* cites case law holding that a debtor actually lacks standing to bring an equitable subordination action when its purpose is to "remedy wrongdoing by one creditor, in the interests of remaining creditors" (*Applied Theory*, 345 B.R. at 59), and that 4) *Lockwood* found that in a Chapter 7 case it was not the debtor who was an appropriate party to assert an equitable subordination action, but the trustee.

Algonquin also argues that each of these four cases cited by Defendants either deals with claims brought under sections of the Code which specifically identify the entities which may bring such an action (§§ 547, 548 and 549), or were commenced by creditors' committees (which are statutorily created and whose authority is defined by statute). These facts make these cases inapposite, Algonquin contends, because the instant Adversary Proceeding does not involve claims arising under Code sections that limit who may assert the claims.

As a counter to the Defendants' argument that the Adversary Proceeding should be

---

*Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 709 (S.D.N.Y. 2001) citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991) (emphasis added).

dismissed because the Debtors were not joined as parties, Algonquin contends simply that the Debtors have an absolute right to intervene in the Adversary Proceeding.  Algonquin asserts that this is made even more relevant by the fact that Steckler is a controlling principal in both the Debtors and Defendants.

Algonquin also contends that the Defendants' argument that the Court should abstain until the claim is ripe (when a new plan is filed) fails to take into account the Debtors' expired exclusivity period, as well as the fact that a determination regarding the treatment of approximately $12,000,000 in unsecured claims will have a material impact on the distribution to all creditors.

Defendants' Reply to Objection to Motion to Dismiss

In reply to Algonquin's Objection to Defendants' Motion to Dismiss, Defendants reassert that because all creditors would either benefit or be adversely affected by the outcome of Algonquin  subordination action, Algonquin is really seeking to act in a representative capacity. Defendants take issue with Algonquin's assertion that all creditors have standing to bring an equitable subordination action and need not seek leave of court to bring such a proceeding, again citing *STN*.  Defendants maintain that *STN* requires an entity seeking to act in a representative capacity to obtain leave of court to bring an Adversary Proceeding, and establishes criteria for this determination, and that *STN* applies to individual creditors pursuant to *Housecraft*.  Defendants further contend, and cite *In re Morpheus Lights, Inc*., 228 B.R. 449, 454 (Bankr. N.D. Cal. 1998) for the proposition, that an equitable subordination claim does require "the application of the *STN* procedure because the purpose of equitable subordination is to undo alleged wrongdoing by an

individual creditor in the interest of all other creditors." *See* Reply to Objection to Motion to Dismiss, p.3. Defendants also argue that the relief demanded by Algonquin "necessarily affects all creditors of Debtor equally," citing *In re KDI Holdings, Inc.*, 277 B.R. 493, 503-504 (Bankr. S.D.N.Y. 1999) in support of that argument. *See* Reply to Objection to Motion to Dismiss, p.3.

The *STN* procedures are all the more relevant in this case, the Defendants contend, because their application would give the Court the opportunity to determine both whether Algonquin even has any stake in the outcome of the litigation, as well as whether the Adversary Proceeding is likely to benefit the estate. Defendants also respond to Algonquin's contention that the Debtors could easily intervene in the action by pointing out that, even if the Debtors were to intervene, this would still leave the Court in the position of having to decide which of the two parties (Debtors or Algonquin) would have standing to act for the estate.

Plaintiffs' Supplemental Objection to Defendants' Motion to Dismiss

Algonquin also contends that it did in fact ask Debtors, twice, to either pursue the subject litigation or consent to Algonquin's doing so, but received no response.[4]

*Racing Services* Case

In its final April 13, 2007 Memorandum of Law in Support of Authority to Prosecute Action and in Opposition to Motion to Dismiss, Algonquin argues that in *In re Racing Services, Inc.*, 363 B.R. 911 (8th Cir. B.A.P. 2007), the Eighth Circuit Bankruptcy Appellate Panel found that parties asserting objections to claims under Code § 502, or subordination actions under

---

[4] Algonquin attaches copies of a November 14, 2006 letter and a February 26, 2007 e-mail to counsel for Debtors to support this contention.

§ 510(c), are not required to obtain permission from the court before commencing such an action. More specifically, the *Racing Services* court held that "[t]he language of [Code] Section 510(c) contains no restrictions on who may request the subordination of a claim.  Consequently, the Plaintiff does not need permission from the court to request such relief." *Id.* at 912.

Defendants attempt to distinguish *Racing Services* by pointing out that the creditor prosecuting the litigation in that case was the largest general unsecured creditor of the estate, making the standing issue moot.  Defendants argue that this holding is actually consistent with the holdings of *KDI* and *Morpheus Lights*, because those cases held that standing exists in equitable subordination cases only if the party is seeking to redress individualized harm or otherwise qualifies to act as a representative of all creditors.

Algonquin's Motion for Permission to Prosecute Action

In response to Defendants' argument that Algonquin must obtain permission from the Court to commence its Adversary Proceeding based upon *STN* and *Housecraft*, Algonquin, apparently, out of an abundance of caution, seeks *nunc pro tunc* approval from the Court to prosecute the Adversary Proceeding.  Although Algonquin's motion does not mention the date upon which this requested approval is to be effective, the Court assumes Algonquin is requesting approval *nunc pro tunc* to the date it filed the Complaint commencing this Adversary Proceeding, to wit: September 1, 2006.

In support of this relief, Algonquin argues that it should be granted *nunc pro tunc* approval to continue with the Adversary Proceeding in order to reach the substance of the Complaint as quickly as possible.  In support of this argument, Algonquin contends that a determination as to

the validity of approximately $12,000,000 in unsubstantiated insider claims would best serve the interests of the Debtors' legitimate creditors, especially because Debtors are unwilling to pursue this action themselves.  Algonquin cites *In re Matco Electronics Group, Inc.*, No. 02-60835, slip op. at 11 (Bankr. N.D.N.Y. July 10, 2002) for the proposition that *nunc pro tunc* approval for creditors' committees to commence Adversary Proceedings is granted when "the overall fairness concept of the bankruptcy laws mandates that the debtor's transactions should not pass without examination."  *Id.* at 14.

Debtors, who had not previously submitted papers in this matter because they were not a named party in the Adversary Proceeding, submitted opposition to Algonquin's Motion for Permission to Prosecute Action.  Debtors argue that Algonquin's request for approval to maintain the Proceeding should be denied because, 1) the Debtors are already engaged in extensive discovery in district court litigation with Algonquin, and additional discovery would be a waste of the estates' assets, 2) Debtors have an agreement with Defendants to equitably subordinate their claims, and 3) Debtors believe the litigation of these claims is premature and not necessary or beneficial to a resolution of the bankruptcy proceedings.

## DISCUSSION

Defendants' Motion to Dismiss

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, the court merely assesses the legal feasibility of the complaint, and is required to accept as true all factual allegations in the complaint.  *See Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998).

The Court will draw all inferences in the plaintiff's favor.  *See Ganino v. Citizens Utilities Co.*,

228 F.3d 154, 161 (2d Cir. 2000).

Dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is granted only if the plaintiff's complaint

fails to allege "'enough facts to state a claim to relief that is plausible on its face.'" *See Oglesby*

*v. Eikszta*, 2007 U.S. Dist. Lexis 47472 *12 (N.D.N.Y. 2007); *quoting Iqbal v. Hasty*, 490 F.3d

143, 156 (2d Cir. 2007) (noting that in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969

(2007) the Supreme Court disavowed the much-cited standard in *Conley v. Gibson*, 355 U.S. 41,

45-46 (1957) which required that a complaint not be dismissed for failure to state a claim "unless

it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief."). [5] The court's inquiry "is not whether the plaintiff will prevail, but

whether the plaintiff is entitled to offer evidence to support his claims." *See Transit Rail, LLC*

*v. Marsala*, 2007 U.S. Dist. Lexis 52822 *12 (W.D.N.Y. 2007) (citations omitted).


Equitable Subordination Claim

The first issue the Court will address is whether Algonquin is seeking to act in a

representative capacity.  Throughout the Motion to Dismiss, Defendants allege that by attempting

to equitably subordinate the subject claims, Plaintiffs are seeking to act "as representatives of all

unsecured creditors." *See* Motion to Dismiss, ¶ 2.  However, nowhere do Defendants cite support

for their allegation that by seeking to equitably subordinate the subject claims Algonquin is acting

---

[5] The Second Circuit Court of Appeals in *Iqbal* characterized the Supreme Court's new standard as one which requires "a flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d at 157-58 (emphasis in original).

in such a representative capacity.

On the other hand, *Applied Theory*, a case upon which Defendants rely, cites to a Seventh

Circuit Court of Appeals case, *In re Vitreous Steel Products Co.*, 911 F.2d 1223, 1231 (7ᵗʰ Cir.

1990), which directly addresses the issue of whether a creditor prosecuting an equitable

subordination claim is acting on behalf of all unsecured creditors.  In support of its holding that

an unsecured creditor does have standing to seek equitable distribution of another creditor's claim

under Code § 510, the court opined that

> [e]quitable subordination is not a benefit to all unsecured creditors equally, at least
> where the creditor whose claim is objected to is at least partially unsecured; it is
> a deterrent to the creditor whose debt is subordinated.  *Thus, when a party seeks
> equitable subordination, it is not acting in the interests of all the unsecured
> creditors*.  While the Trustee may find that it is in the best interests of the estate
> to seek equitable subordination, *individual creditors have an interest in
> subordination separate and apart from the interests of the estate as a whole*.  The
> individual creditor should have an opportunity to pursue its separate interest.

*Id*. (emphasis added).

Nor is this view of equitable subordination limited to the Seventh Circuit.  "Although

not technically a standing issue, the remedy of equitable subordination is not limited to a trustee,

and one creditor may seek to equitably subordinate another creditor's claim to his own." *In re

Granite Partners, L.P.*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997) (citing *In re Giorgio*, 862 F.2d

933, 939 (1ˢᵗ Cir. 1988) (opining that equitable subordination "permits a bankruptcy court to take

account of misconduct of one creditor towards another...")) .

Defendants also allege that Algonquin needs court approval to bring its Adversary

Proceeding seeking equitable subordination of the subject claims, and cite *In re Morpheus Lights,

Inc.*, 228 B.R. at 454 for that proposition.  However, the *Morpheus Lights* court based its holding

16

that court permission is required for a creditor to bring an equitable subordination claim upon its

finding "that requiring a creditor-plaintiff to seek the court's permission before bringing a claim

*on behalf of the estate* is supported by sound policy reasons." *Id.* (emphasis added).  This Court

finds the holding in *Morpheus Lights* distinguishable to the extent that it is based on the

assumption that an equitable subordination claim is brought only on behalf of the estate, i.e. by

a creditor acting in a representative capacity.

The Seventh Circuit Court of Appeals' treatment of this issue in *Vitreous Steel* is

instructive.  In support of its finding that "an unsecured creditor has no standing without first

obtaining special authorization from the court" (*Vitreous Steel Products Co.*, 911 F.2d at 1231),

the *Vitreous Steel* court cited cases for the proposition that court permission was required for an

unsecured creditor to bring claims of fraudulent conveyance (*In re Xonics Photochemical, Inc.*

841 F.2d 198, 202-3 (7th Cir. 1988)), preference actions (*Koch Refining v. Farmers Union Central*

*Exchange, Inc.* 831 F.2d 1339 (7th Cir. 1987)), the Trustee's strongarm powers (*Moyer v. Dewey*,

103 U.S. 301 (1881)), and state law claims of conversion (*Redman v. Gould*, 7 Blackf. 361, 362

(Ind. 1845)).  It cited no cases for the proposition that court permission was required to bring a

claim for equitable subordination.

In fact, the *Vitreous Steel* court's support for the type of claims which will require court

permission for a creditor to bring dovetails nicely with Algonquin's attempt to distinguish

Defendants' reliance upon case law.  Algonquin notes that *STN* and *Housecraft* both involve so-

called avoidance actions brought under Code § 547 (preferences), § 548 (fraudulent transfers) or

§ 549 (post petition transactions), and that each of these Code sections specifically identifies the

entities who may maintain such an action. This reasoning echoes the *Vitreous Steel* court's

assertion that court permission is required for unsecured creditors to commence fraudulent conveyance and preference actions, as well as actions involving the Trustee's strongarm powers.

The Court agrees that to this extent the holdings in *STN* and *Housecraft* are distinguishable. *STN*'s essential holding is that a creditors' committee can initiate an adversary proceeding "only when the trustee or debtor in possession unjustifiably failed to bring suit or abused its discretion in not suing to avoid a preferential transfer." *See STN Enterprises,* 779 F.2d at 904. But Algonquin is correct to point out that these two cases involved creditors' committees or trustees pursuing preferentially or fraudulently transferred assets, not an individual creditor's request for equitable subordination of a claim. *Housecraft*, in a footnote, extended *STN*'s holding to include an individual creditor. This extension of *STN*'s holding, however, applies to an individual creditor making claims under Code §§ 548 and 549, as the plaintiff in *Housecraft* did. *See In re Housecraft Industries USA, Inc.*, 310 F.3d at 71 n.7. Footnote 7 to *Housecraft* states that "[n]umerous courts have granted individual creditors standing to sue in the stead of a trustee or debtor-in-possession." *See id.* However, each of the five cases cited in that *Housecraft* footnote for this proposition involved Code §§ 547, 548 or 549 transfers (or their pre-Code equivalents). None addressed either a Code § 502(a) objection or a Code § 510(c) claim.[6] Had Algonquin been acting in a representative capacity or pursuing a claim under Code §§ 547, 548

---

[6] In a decision which discussed both *STN* and *Housecraft* in considerable detail, U.S. Bankruptcy Judge Robert E. Gerber of the Southern District of New York stated that "[t]he practice of authorizing the prosecution of actions on behalf of an estate by committees, and even by individual creditors, upon a showing that such is in the interests of the estate, is one of long standing, and nearly universally recognized." *See In re Adelphia Communications Corp.*, 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005). For support of this assertion Judge Gerber cites to the *Housecraft* footnote, which, as noted *supra*, relies exclusively upon cases involving Code §§ 547, 548 or 549 actions.

or 549, Defendants' reliance upon *STN* and *Housecraft* would be justified.

Defendants rely heavily on the *Applied Theory* decision, which opined that "[t]he purpose of equitable subordination is to undo wrongdoing by an individual creditor in the *interest of the other creditors*." *In re Applied Theory*, 345 B.R. at 59 (emphasis added). The *Applied Theory* court also found, however, that "[t]hose courts that have allowed creditors to bring claims for equitable subordination have done so where an individual creditor sought to bring the equitable claim for *its own benefit*." *Id.* (emphasis added) (citing *In re Vitreous Steel*, 911 F.2d at 1231 and *In re Hoffinger Indus.*, 327 B.R. 389, 394 (Bankr. E.D. Ark. 2005)).

However, this Court views the distinction between a creditor commencing an equitable subordination adversary proceeding for "its own benefit" and one brought "in the interest of other creditors" as significantly less than a bright line demarcation. As mentioned *supra*, the *Vitreous Steel* court found that "individual creditors have an interest in subordination separate and apart from the interests of the estate as a whole. The individual creditor should have an opportunity to pursue its separate interest." *See In re Vitreous Steel Products Co.*, 911 F.2d at 1231. The *Vitreous Steel* court did not find that only in the particular facts before it did the creditor seek to bring the claim for its own benefit exclusively, but that **"**[t]he individual creditor should have an opportunity to pursue its separate interest." *Id*.

The *Hoffinger Industries* decision goes even further along these lines, and sheds some interesting light on the purportedly clear difference between a claim for equitable subordination brought "for [the creditor's] own benefit" and one brought and one brought "in the interest of the other creditors." *See In re Applied Theory*, 345 B.R. at 59. Speaking directly of the standard laid

out in *Morpheus Lights*,[7] the *Hoffinger Industries* court admitted that if the standing of its plaintiff

presenting the equitable subordination claim were to be judged by the "mechanical" standard laid

out in *Morpheus Lights*, it would lack standing.  What the *Hoffinger Industries* court recognized,

however, is that

> there will always be at least one or more other creditors the alleged generalized
> harm has not harmed, and the cure will not benefit...Because of this, the court
> questions whether there can ever be a 'general' equitable subordination claim that
> only belongs to the trustee or debtor-in -possession.  The specific wording of §
> 510(c) recognizes this in the 'all or part of another allowed claim' language.  It
> would be absurd to permit the estate alone to seek to reorder priorities among
> specific creditors on all or part of their debt... *This is perhaps especially so in this
> instance where the debtor, for now obvious reasons, has shown no interest in
> contesting [its related entity's] proof of claim*. It is simply not logical to suggest
> that if many are harmed, then no more than one of the harmed may pursue the
> action.

*In re Hoffinger Industries*, 327 B.R. at 413-14 (emphasis added).

Not only does the *Hoffinger Industries* court undermine the amorphous general/particular

dichotomy regarding equitable subordination claims, but it highlights the need to abandon such

rigid distinctions in cases where, as in the instant case, an insider relationship makes the Debtors

reluctant or unable to pursue the subject equitable subordination claim.

It is worth noting that although Code §1107 provides a debtor in possession with all the

rights of a Chapter 11 trustee, at least one court has commented on the significance of the

distinction between a trustee and a debtor, "evidenced by the potential for divergence of interest

between a debtor in possession and a trustee in representing creditors." *See In re Fargo Financial,*

---

[7] The *Morpheus Lights* decision held that an individual creditor has standing to bring an
equitable subordination claim only if the claim was not a "general" one; in other words, the
creditor had to possess a "particularized injury" arising from the claim in order to have standing.
*See In re Morpheus Lights*, 228 B.R. at 453.

*Inc.*, 80 B.R. at 252.  The *Fargo Financial* court cited to *In re Chase & Sanborn Corp.*, 813 F.2d

1177 (11th Cir. 1987), in which the Eleventh Circuit Court of Appeals affirmed a district court

decision which held that although a trustee had not been appointed by the court, the debtor in

possession was not the proper party to pursue a claim under Code §548 because "*the debtor in

possession had interests in common with the defendants in [the] case.*"  *Id.* at 1180 (emphasis

added).[8]

    The Court believes that *Applied Theory* is inapposite.[9]  First, the *Applied Theory* (district)

court based its findings on factual determinations made by an order of the bankruptcy court that

"the Committee's equitable subordination claim would seek to redress injuries 'allegedly inflicted

upon the Debtors and their creditors generally' and that any claim 'would not be directed toward

any particularized injury suffered by any creditor.'" *In re Applied Theory Corporation*, 345 B.R.

at 59.  Second, that court also found that it was appropriate for the bankruptcy court to apply the

*STN* factors "because the equitable subordination claim could have been properly brought by the

trustee..."  *Id.*   In the instant case, an individual creditor seeks to prosecute the equitable

subordination claim, not a creditors' committee.  Also, unlike the facts in *Applied Theory*, there

---

    [8] Similarly, courts have held that in the context of a Code § 502 objection to claim, "[t]o require a chapter 11 creditor to first request the debtor in possession to take action would be an act of futility in most instances."  *See In re Charter Co.*, 68 B.R. 225, 228 (Bankr. M.D. Fla. 1986).  *See also In re Revco D.S., Inc.*, 1990 Bankr. Lexis 2966 (Bankr. N.D. Oh. 1990) (opining that  when no trustee has been appointed, courts have allowed general creditors to object to the claims of other creditors without first attempting to persuade the debtor, and that a debtor may have interests that militate against its objecting to the claim of a particular creditor).

    [9] *See also* the Court's discussion of the Court of Appeals for the Second Circuit's recent decision affirming *In re Applied Theory Corp.*, 345 B.R. 56 (S.D.N.Y. 2006), *infra*.

21

is no trustee to file such a claim.[10]

Moreover, *Applied Theory* dealt exclusively with a creditors' committee commencing the adversary proceeding, not an individual creditor.  When the *Applied Theory* court does mention an individual creditor, it cites approvingly to two cases[11] where individuals creditors were allowed "to bring the equitable claim for [their] own benefit." *In re Applied Theory Corporation*, 345 B.R. at 59.

*Racing Services* Case and Algonquin's Motion Seeking Authority to Prosecute Action

Algonquin's citation to the *Racing Services* decision from the Eighth Circuit Court of Appeals' Bankruptcy Appellate Panel is on point.  Its holding that parties in interest objecting to claims under Code § 502 or subordination actions under Code § 510(c) are not required to obtain permission from the court before commencing the action is persuasive, especially because the *Racing Services* court acknowledges that "prior court approval *is* required for a creditor to assert an *avoidance action*." *See In re Racing Services, Inc.*, 363 B.R. at 916 (emphasis added). Defendants attempt to distinguish *Racing Services* by contending that the creditor in *Racing Services* was the largest unsecured creditor of the estate, making the standing issue moot. Defendants fail to mention, however, that APIF itself is the rightful holder of a note in the original

---

[10] It is also worth noting that in the *Applied Theory* case, the creditors' committee had first gone to the trustee, who declined to pursue the equitable subordination action.  The Bankruptcy Court itself issued an Order holding that the "Trustee has the sole and exclusive right to assert the claim" (345 B.R. at 58) after the creditor whose claim the committee sought to subordinate filed a motion seeking limitation of the scope of the committee's authority to engage in litigation.

[11] *Vitreous Steel*  and *In re Hoffinger Industries.*

amount of $15,800,000 issued by Debtors TPI and CFC,[12] making APIF a significant creditor of the instant estate.

<u>Recent Court of Appeals for the Second Circuit's Affirmance of *In re Applied Theory*</u>

On July 9th, the Second Circuit Court of Appeals issued its decision in *In re Applied Theory Corp.*, 2007 U.S. App. Lexis 16180 (2d Cir. 2007), affirming *In re Applied Theory Corp.*, 345 B.R. 56 (S.D.N.Y. 2006). The Court will examine this decision only to the extent that its findings affect the Court's distinguishing the lower court's decision.

As mentioned *supra*, one of the primary distinguishing factors of the district court's findings in *Applied Theory* is that the district court was addressing litigation commenced by a creditors' committee, as opposed to an individual creditor as in the instant case. The Court of Appeals also stresses this factor as a primary reason for affirming the lower court. The Court of Appeals' decision is worth quoting at some length in order to discern the level of importance it places upon whether the party bringing the action is a creditors' committee or an individual creditor. The final four sentences of the Court of Appeals' decision read:

> It is clear to us, as it was to the district court and the bankruptcy court, that the Committee's proposed equitable subordination claim would not be directed toward any particularized injury suffered by any creditor. The Committee has demonstrated no interest of its own in subordination separate and apart from the interests of the estate as a whole, and has failed to demonstrate why it should be permitted to step into the shoes of the trustee.
>
> In any event, regardless of how the Committee characterizes it, any equitable subordination claim brought by the Committee would allege harm to the Debtor [sic] generally and would seek to subordinate the Lenders to other creditors. *Since*

---

[12] The so-called 'B' Note, one of two notes resulting from the restructuring of the Aetna Financing.

*the Committee is not itself a creditor, it does not have any rights held by any creditor to assert such a claim against another creditor.  In other words, the Committee has not sustained any injury for which a 'direct' claim might otherwise be available.*

*In re Applied Theory Corp.*, 2007 U.S. App. Lexis 16180 * 9-10 (2d Cir. 2007) (emphasis added)

(citations omitted).

The Court of Appeals clearly attaches significant importance to the fact that the Committee is not itself a creditor.  In fact, the last two sentences of the decision (and quoted section) very nearly explicitly state, to the contrary, that an individual creditor, as opposed to a creditors' committee, does have a right to assert a claim against another creditor, and that it may well have sustained an injury for which a direct claim may be available.  In point of fact, one can see with even greater clarity than in the district court decision the significant weight the Court of Appeals attaches to the claimant's status as a creditors' committee as opposed to an individual creditor when we read the court's rationale for requiring bankruptcy court approval before a creditors' committee can commence an adversary proceeding:

Reorganizations would routinely spin out of control if decisions that would commit the time and limited resources of the estate could be taken without the consent of the bankruptcy court, the entity charged by law with controlling and regulating such matters. Requiring bankruptcy court approval conditioned upon the litigation's effect on the estate helps prevent committees and individual creditors from pursuing adversary proceedings that may provide them with private benefits but result in a net loss to the entire estate.

*Id.* at 6-7.[13]

───────────────

[13] The Court interprets the Second Circuit Court of Appeals' use of the term "individual creditors" in this quote as dictum.  The facts before the Court of Appeals involved a creditors' committee rather than an individual creditor, and the analysis supporting the decision's holding (conserving the limited resources of the estate) applies to creditors' committees rather than individual creditors.  The reference to "individual creditors" is not necessary to the holding of Applied Theory, especially in light of the high burden Code § 503(b)(3) places on individual

This Court agrees that a creditors' committee commencing an adversary proceeding may well "commit the time and limited resources of the estate." Thus, that fact alone can serve as a rational justification for requiring creditors' committees to obtain bankruptcy court approval before commencing any litigation. But the same cannot be said of individual creditors. Their commencing litigation in bankruptcy court seldom commits resources of the estate, and has rarely, if ever, caused "reorganizations [to] routinely spin out of control." An individual creditor's only avenue for obtaining legal fees and costs from the estate is Code § 503(b). This section reads, in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative expenses,...
>
> > (3) the actual, necessary expense, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by-...
> >
> > (B) a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;...
> >
> > (D) a creditor..., in making a substantial contribution in a case under chapter 9 or 11 of this title.
> >
> > (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection...and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

Regarding Code § 503(b)(3)(B), Algonquin would face considerable hurdles in the subsection's requirement that the creditor obtain prior court approval and that the creditor's actions result in actual recovery of property transferred or concealed by the debtor. Insofar as Algonquin's argument in this Adversary Proceeding rests upon the dual contentions that it need not obtain this

---

creditors seeking reimbursement from the estate of legal fees and costs. This analysis is developed further *infra*.

Court's permission to pursue the equitable subordination action, and that it is acting on its own behalf, rather than in a representative capacity, it will not be heard, at some later date, to argue that its actions benefitted the estate as a whole, and/or that it was indeed acting in a representative capacity.  The law of the case will not permit another result.

As for Code 503(b)(3)(D) and (4),

> efforts undertaken by creditors solely to further their own self-interest are not compensable under section 503(b).  The integrity of § 503(b) can only be maintained by strictly limiting the compensation to *extraordinary creditor actions* which lead directly to tangible benefits to the creditors, debtor or estate. Compensation must be preserved for those *rare occasions* when the creditor's involvement truly fosters and enhances the administration of the estate.  Thus, the general rule remains that attorneys must look to their own clients for payment.

*In re Alert Holdings Inc.*, 157 B.R. 753, 757 (Bankr. S.D.N.Y. 1993) (emphasis added) (citations omitted).

Moreover, "'[c]reditors face an especially difficult burden in passing the substantial contribution test since they are presumed to act primarily in their own interests.'"  *In re Best Products Co., Inc.*, 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994) (quoting *In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989).

The most specific holding of the Court of Appeals in *Applied Theory* is that it declined "to adopt a bright line rule under which equitable subordination claims may be brought directly by a creditor, creditors, or a creditors' committee, without Bankruptcy Court approval."  *See* 2007 U.S. App. Lexis 16180 *8 (internal quotation marks omitted).  But the court's reluctance to adopt such a bright line rule cannot be construed as a bright line rule holding the obverse: that under no circumstances may an individual creditor bring such a claim without prior Bankruptcy Court approval.  This is especially so given the Court of Appeal's emphasis (quoted *supra*) on the

26

reasons that a creditors' committee, as distinct from an individual creditor, should not be permitted to commence litigation without Bankruptcy Court approval.

Especially in light of the significant restraints on Algonquin's ability as an individual creditor to recover its costs and attorney fees from the estate, the Court finds nothing in the Court of Appeals' recent *Applied Theory* decision to alter its finding that it is distinguishable from the instant case.

The Court sees no direct conflict between the holding of *Racing Services* (that an individual creditor or party in interest is not required to seek bankruptcy court permission in order to pursue equitable subordination), and that of *Applied Theory* (that a creditors' committee is required to obtain bankruptcy court permission to seek the same relief).  While clearly bound by Second Circuit precedent, the Court believes the facts in the instant case are distinct enough to remove it from the reach of *Applied Theory*.


Fed.R.Civ.P. 12(b)(7)Dismiss for Failure to Join Necessary Parties

In response to Plaintiffs' argument that they have not failed to join a necessary party because the Debtors are free to intervene, Defendants assert that if the Debtors were to intervene,

> the Court would be faced with two parties seeking to act in a representative capacity, and the Court would still be faced with the determination of a dispute as to which party --Debtor or Plaintiff-- have [sic] standing to act for the estate.

Reply to Plaintiffs' Objection to Motion to Dismiss, p. 5.

As mentioned *supra*, however, the Court does not believe that Plaintiffs are seeking to act in a representative capacity.  Thus, Defendants' arguments against intervention are not convincing. The Court believes that, especially given the uncontested nature of the common ownership and

management shared by the Debtors and Defendants, Plaintiffs' argument that the controlling

officer of both Debtors and Defendants could easily have Debtors intervene overtakes Defendants'

Fed.R.Civ.P. 12(b)(7) argument.

Moreover, the case Defendants cite to support their contention that the Complaint should

be dismissed because it is not feasible to join all parties in interest to this Adversary Proceeding,

*In re Rouge Industries, Inc.*, 236 B.R. 55, 59-60 (Bankr. D. Del. 2005), is inapposite.  *Rouge*

*Industries* involved a chapter 11 debtor's customer suing the debtor, seeking a determination that

the debt owed by the customer to the debtor (debtor's account receivable) was not transferred in

the debtor's § 363 asset sale to a third party buyer.  The court found only that "[a] determination

of ownership to assets allegedly transferred between a buyer and a seller should not be attempted

without both parties to the transaction being before the court."  *Id.* at 59.   This is clearly not

analogous to the matter at hand, where there is no seller or third party buyer, no documented

transaction, and no ownership rights at stake.  Defendants did not cite to, and this Court did not

find, any case law which stands for the proposition that any party affected by the proposed change

in priorities in an action for equitable subordination is a necessary party to that action.


Court Should Abstain from Hearing the Adversary Proceeding

Defendants' argument that the Court should abstain from hearing this Adversary

Proceeding, pursuant to the permissive abstention provision of 28 U.S.C. § 1334(c)(1), because

it is premature and not ripe due to the lack of a plan of reorganization is similarly unpersuasive.[14]

_____

[14] This section of the U.S. Code reads, in relevant part,  "... nothing in this section prevents
a district court in the interest of justice, or in the interest of comity with State courts or respect
for State law, from abstaining from hearing a particular proceeding arising under title 11 or

The only case Defendants cite in support of their call for abstention is *In re Mall at One Associates, L.P.*, 185 B.R. 1009 (Bankr. E.D. Pa. 1995).  *Mall at One Associates* involved a tax dispute between the debtor's mortgagee and the taxing authority, which the court found (despite its Code § 505 powers) the parties "can and should litigate elsewhere." *Id.* at 1016.[15]

Defendants first contend that the equitable subordination action will not be ripe until a plan of reorganization is filed.  Second, Defendants maintain that the Court should refrain from adjudicating a dispute between creditors which will have little effect on the administration of the debtor's estate.  Defendants' arguments in this regard suffer from the existence of two facts: 1) that a dispute over approximately $12,000,000 in unsecured claims some five years into Debtors' cases, and after their period of exclusivity has already expired, cannot easily be characterized as not ripe for adjudication, and 2) that in the instant case there is an uncontested affiliation between the subject creditors (Defendants) and the Debtors.  Defendants do not cite any case in which a bankruptcy court abstained from deciding a core equitable subordination action pursuant to Code § 1334(c)(1).[16]

---

arising in or related to a case under title 11." 28 U.S.C. § 1334 (c)(1).

[15] It is worth noting, however, that unlike the claims at issue in *Mall at One*, "[c]*laims for equitable subordination are core [proceedings]* and are automatically referred to the bankruptcy court under the general order of reference." *In re Granite Partners, L.P.*, 210 B.R. 508, 518 (Bankr. S.D.N.Y. 1997) (citations omitted) (emphasis added).

[16] The Court was able to find only one such case: *In re Mid-City Ventures*, 1992 Bankr. Lexis 300 (Bankr. W.D. Tenn. 1992).  In *Mid-City*, however, the plaintiff was the only potential creditor of the debtor, and the creditor whose claim the plaintiff wished to subordinate had no allowable claim against the estate, having released it in a settlement.  The *Mid-City* court concluded the action was a two-party dispute, with no effect upon the bankruptcy estate. *See id.* at 15.

Recharacterization

         A cause of action for recharacterization is separate and distinct from a claim for equitable

subordination.[17]  *See In re Lifschultz Fast Freight*, 132 F.3d 339, 345 n.3 (7th Cir. 1997) (citing

*In re Hyperion Enterprises*, 158 B.R. 555, 560 (D.R.I. 1993).  Although the effects of equitable

subordination and a claim for recharacterization may be similar, or even identical, in many

instances, "there are important differences between a recharacterization analysis and an equitable

subordination analysis."  *In re Submicron Systems Corp.*, 291 B.R. 314, 322 (D. Del. 2003).[18]

         This Court has the power to recharacterize the subject debt as equity.  "Bankruptcy judges

are empowered to recharacterize loans under their general equitable powers pursuant to Section

105 of the Code."  *In re S.M. Acquisitions Co.*, 332 B.R. 346, 351 (Bankr. N.D. Ill. 2005).  "In

holding that the recharacterization power is integral to the consistent application of the [Code],

we join every other circuit that has considered the question."  *In re Dornier Aviation*, 453 F.3d

225, 233 (4th Cir. 2006).

---

         [17] Plaintiffs' request for recharacterization of the Defendants' claims does not require the
commencement of an adversary proceeding pursuant to Fed.R.Bankr.P. 7001. *See, e.g., In re
Micro-Precision Technologies, Inc.*, 303 B.R. 238, 243 (Bankr. D.N.H. 2003). Thus, had
Plaintiffs merely objected to the Defendants' claims and/or sought to recharacterize them as
equity, the Court would have treated this as a contested matter, and the entire thicket of case law
cited by Defendants would not have been even arguably relevant.  But because they were included
in the Adversary Proceeding for equitable subordination, they are subject to Defendants' standing
arguments.  *See In re Metiom*, 301 B.R. 634, 639 (Bankr. S.D.N.Y. 2003) (opining that "when
one of the types of relief specified in [Fed.R.Bankr.P.] 7001 is raised in a claim objection, the
objection automatically becomes more than a contested matter under [Fed.R.Bankr.P.] 9014.").

         [18] "Recharacterization cases turn on whether a debt actually exists, not on whether the
claim should be equitable subordinated." *Id.  See also In re Adelphia Communications Corp.*,
2007 Bankr. Lexis 1942 *134 (Bankr. S.D.N.Y. 2007) (opining that "recharcterization analyses
focus on the substance of the *transaction*, whereas equitable subordination analyses focus on the
*creditor's behavior*.") (emphasis in original) (citations omitted).

Although the Second Circuit Court of Appeals has not addressed the issue of recharacterization, Bankruptcy Judge Gerber has noted that "[t]he court rejects the contention...that bankruptcy courts lack the authority to recharacterize debt as equity." *In re Adelphia Communications Corp.*, 2007 Bankr. Lexis 1942 at 132 n. 209 (citing *In re Dornier Aviation, Inc.*, 453 F.3d at 231).

There are eleven factors courts examine in order to determine whether a debt should be recharacterized as equity:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; (11) the presence or absence of a sinking fund to provide repayments.

*In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749-750 (6th Cir. 2001) (citing *Roth Steel Tube Co. v. Commissioner of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986)).

These are known as *Roth Steel* or *AutoStyle* factors.[19]  Both the *Roth Steel* and *AutoStyle* courts note that no one factor is controlling or decisive, and that the factors must be considered within the particular circumstances of each case.  *See AutoStyle*, 269 F.3d at 750.

Without going into each of the *AutoStyle* factors (unnecessary due to the Fed.R.Civ.P.

---

[19] The *AutoStyle* court did note that "the *Roth Steel* factors were formulated in the context of a tax court case [and] provide a general framework for assessing recharacterization claims that is also appropriate in the bankruptcy context. We note, however, that there is some disagreement as to whether tax court recharacterization factors are appropriate for use in bankruptcy cases." *Id.* at 750.

31

12(b)(6) criteria), it is worth noting the observation of Bankruptcy Judge Gerber regarding

recharacterization:

> [T]he paradigmatic situation for recharacterization [is] where the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.

*In re Adelphia Communications Corp.*, 2007 Bankr. Lexis 1942 at 134-135.

In *Adelphia Communications* the court was faced with transactions between Chapter 11

debtors and independent lenders which were clearly documented as debt, and where the plaintiff

failed to address any of the *AutoStyle* factors.  As a result, the court granted the defendants'

motion to dismiss.  In the matter at hand, however, Defendants have provided no documentation

to support their contention that the transactions were not equity injections, and the Plaintiff has,

in fact, alleged several violations of the *AutoStyle* factors.

Another rule of thumb in recharacterization analyses is that "the claims of creditors who

were corporate insiders and/or had conducted their transactions with the debtors in some

inequitable manner are closely scrutinized [in recharacterization cases]." *See In re Micro-*

*Precision Technologies, Inc.*, 303 B.R. 238, 247 (Bankr. D.N.H. 2003).  As Bankruptcy Judge

Gerber did in *Adelphia Communications*, the *Micro-Precision* court emphasized that the degree

of affiliation between the creditor and the debtor will be positively correlated with the level of

scrutiny to which the transactions are subjected in recharacterization requests.

In the instant case the uncontested links between Defendants and the Debtors, the lack of

any documentation evidencing the purported debt, as well as the Aetna loan documents

prohibiting Debtors from incurring any other debt all argue strongly against a dismissal of

Algonquin's request for recharacterization at this juncture.


Plaintiffs' Motion for Permission to Prosecute Action

Because the Court finds that *STN* does not apply to the instant case, the Court need not consider Plaintiffs' request for *nunc pro tunc* authorization to prosecute the causes of action contained in the Complaint.[20]  For the same reason, the Court finds that Plaintiffs do in fact have standing to bring those causes of action.

Defendants have failed to show that the Plaintiffs' Complaint has not alleged enough facts to state a claim to relief that is plausible on its face.

Based on the foregoing, it is hereby

**ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Complaint is DENIED; and it is further

**ORDERED** that Defendants' request that this Court abstain from determining the Adversary Proceeding is DENIED; and it is further

**ORDERED** that Plaintiffs' Motion for Permission to Prosecute Action is RENDERED

---

[20] It's worth noting, however, the existence of a line of cases which stands for the proposition that a creditors' committee which has already instituted an adversary proceeding can obtain *nunc pro tunc* approval from the bankruptcy court to prosecute the action. "'The general rule is that adversary proceedings *instituted by the creditors' committee* on the estate's behalf require prior court approval; in appropriate circumstances, however, a court may grant retroactive approval.'"  *In re KDI Holdings, Inc.*, 277 B.R. at 505 (quoting *In re America's Hobby Center, Inc.*, 223 B.R. 275, 281 (Bankr. S.D.N.Y. 1998) (citing *In re Catwil Corp.*, 175 B.R. 362, 364 (Bankr. E.D. Ca. 1994))) (emphasis added). The Court can see no reason this same rationale would not apply equally to adversary proceedings commenced by individual creditors, especially in light of the fact that, as mentioned *supra*, individual creditors' adversary proceedings do not "commit the time and limited resources of the estate" to the same extent that creditors' committees do.

33

MOOT in light of Plaintiffs' standing to maintain the causes of action contained in the Complaint

without prior Court Authorization.


Dated at Utica, New York

this 30th day of August 2007


                                        /s/  Hon. Stephen D. Gerling
                                        STEPHEN D. GERLING
                                        Chief U.S. Bankruptcy Judge